**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   HASAN ARDA AKSU,                           No. C12-04268 CRB

12            Plaintiff,

13      v.

14   COUNTY OF CONTRA COSTA et al.,

15            Defendant.
     _____/

16

17   MITCHELL KATZ,                             No. C11-5771 CRB

18            Plaintiff,

19                                        **ORDER GRANTING IN PART**
                                          **MOTIONS FOR SUMMARY**
20   v.                                   **JUDGMENT**

21   COUNTY OF CONTRA COSTA, et al.,

22            Defendants

23   _____/

24          Having granted Defendant Stephen Tanabe's motion to reconsider at the April 17,

25   2015 motion hearing, the Court hereby GRANTS IN PART Tanabe's Motions for Summary

26   Judgment as to Plaintiffs' Fourth Amendment claims, and the related conspiracy claims, in

27   the Katz and Aksu cases.  See MSJ (dkt. 60) in Case No. 12-4268 CRB; MSJ (dkt. 109) in

28   Case No. 11-5771 CRB.

United States District Court
For the Northern District of California

## I.      BACKGROUND

Defendant Stephen Tanabe was, at all relevant times, a deputy sheriff employed with the Contra Costa County Sheriff's Office and assigned to the Danville Police Department. Tanabe Decl. (dkt. 109-2) ¶¶ 2, 6 in Case No. 11-5771 CRB. Tanabe met Defendant Christopher Butler when Tanabe worked as a police officer for the Antioch Police Department between 1995 and 1997. Id. ¶ 4. Sometime after Tanabe left the Antioch Police Department, Butler left that department to start his own private investigation firm. Id. ¶ 5. The two stayed in touch.

As of October 21, 2010,[1] Butler had spoken with Tanabe about participating in a dirty DUI scheme. See Gearinger Decl. Ex. A (dkt. 116-1) at 839 in Case No. 11-5771 CRB. "Tanabe offered to be that officer who would initiate the traffic stop if we could perform the DUI stings in Danville." Id. Butler communicated Tanabe's role in the DUI stings: "if the person consumed enough alcohol to be over .08 and then that person got behind the wheel of a car and started to operate it, we were going to call him and have him effect a traffic stop." Id. at 846.

### A.   Relevant Facts as to Aksu

On the evening of January 9, 2011, Butler contacted Tanabe to determine whether Tanabe would be working. Id. at 876. Tanabe confirmed that he was, and Butler responded, "We will be trying that DUI again tonight." Id. "The plan [on January 9, 2011] was to contact Mr. Aksu using a ruse," having one of Butler's employees "pose as a reporter who was doing a story about successful immigrant businessmen in the East Bay and wanted to include him in a story." Id. at 869-70. Aksu was at the bar that night for approximately two and a half hours. Levitskaia Decl. Ex A (dkt. 60-1) at 355 in Case No. 12-4268 CRB. Once Butler learned that his employee had enticed Aksu to consume enough alcohol that Aksu's blood alcohol level was likely over .08, Butler contacted Tanabe. See Gearinger Decl. Ex. A at 882-83, 90-91 in Case No. 11-5771 CRB. Tanabe asserts: "[a]t approximately 9 pm on

---

[1] Katz's opposition brief states that this date is October 21, 2011. Opp'n (dkt. 116) at 2 in Case No. 11-5771. The transcript just says "October 21." See Gearinger Decl. Ex. A at 839 in Case No. 11-5771 CRB. 2011 makes little sense in the case's chronology.

**United States District Court**
For the Northern District of California

1   January, 2011, Chris Butler informed me he observed [Aksu] visibly intoxicated at the Vine

2   Bar, in Danville, CA, and Chris Butler identified Plaintiff's dark grey Lexus SUV, License

3   Plate Number 5WGG213." Tanabe Decl. (dkt. 60-2) ¶ 9 in Case No. 12-4268 CRB. Butler

4   testified that he sent Tanabe a text message stating "[t]hey are up and heading for the door.

5   The guy keeps talking." Gearinger Decl. Ex. A at 890-91 in Case No. 11-5771 CRB. Butler

6   then observed that Tanabe's patrol car had its lights activated and a car pulled over in front of

7   it, and he videotaped Tanabe arresting and handcuffing Aksu. Id. at 894-95. Tanabe claims

8   that he stopped Aksu's car because it was traveling at a "high rate of speed." Tanabe Decl.

9   (dkt. 60-2) ¶¶ 13, 16 in Case No. 12-4268 CRB.[2] Aksu asserts that he "never drove at a high

10  rate of speed." Aksu Decl. (dkt. 63-3) ¶ 5 Case No. 12-4268 CRB. The Court accepts

11  Aksu's version of events.

12          Tanabe asserts that when he approached Aksu's car, he noticed the odor of an

13  alcoholic beverage and observed that Aksu's eyes were red and glassy. Tanabe Decl. ¶ 17 in

14  Case No. 12-4268 CRB. Tanabe asked Aksu if he had been drinking and Aksu answered that

15  he had had two glasses of wine at the bar. Id. ¶ 18. Aksu testified that he told Tanabe "that I

16  had some drinks." Levitskaia Decl. Ex A at 357 in Case No. 12-4268 CRB. Aksu agreed to

17  let Tanabe check his eyes, and then performed poorly on the eye test. Tanabe Decl. ¶ 19 in

18  Case No. 12-4268 CRB. Aksu then performed unsatisfactorily on further field sobriety tests.

19  Id. ¶ 20. Tanabe administered a breathalyzer test, and Aksu measured a 0.118% BAC. Id. ¶

20  22. Tanabe concluded that "[b]ased upon [Aksu's] objective signs of intoxication, his

21  performance on the FST's, and the results from his [eye test] . . . that [Aksu] was driving . ..

22  under the influence of alcohol, beyond the legal limit," and arrested him. Id. ¶¶ 23-24.

23  Aksu subsequently took a breath test at the Danville Police Department and scored a 0.13%

24  and 0.12% BAC. Id. ¶ 25.

25  //

26

27          [2] Tanabe also claims that he was "never aware of any alleged scheme, plan, or effort by Chris
    Butler or anyone else, to coax and/or persuade Plaintiff to drink, or drive intoxicated, or arrest Plaintiff
28  without probable cause." Id. ¶ 11. For the purposes of this Order, the Court accepts Plaintiffs' version
    of events.

1

**B.  Relevant Facts as to Katz**

2          On the evening of January 14, 2011, Butler confirmed with Tanabe that he would be

3   working that night and able to effect a traffic stop on Katz.  Gearinger Decl. Ex. A at 919 in

4   Case No. 11-5771 CRB.  This time the planned DUI sting involved leading Katz to believe

5   that an employee of Butler's worked for Lifetime Television and wanted to showcase Katz's

6   winery.  Id. at 911.  Butler monitored the DUI sting, including requesting a "tally of how

7   much [alcohol] [Katz] had consumed," and he kept Tanabe informed as the night progressed.

8   Id. at 916-19.  Butler knew that Tanabe "was standing by."  Id. at 920.  Tanabe texted Butler

9   to ask about Katz's alcohol consumption, and Butler responded "He's wasted."  Id. at

10  920-21.  Butler then watched Tanabe pull Katz over and he videotaped Katz's arrest.  Id. at

11  923.

12         Tanabe was assigned to ride along with a Reserve Deputy William Howard on the

13  night of January 14, 2011.  Gearinger Decl. Ex. B at 204, 206.  Tanabe told Howard "that we

14  were going to be conducting a dirty DUI that evening," and he gave Howard "some

15  particulars about the person that was going to be the subject of the arrest."  Id. at 207-08.

16  Howard recalls that Tanabe got a series of calls on his personal cell phone during that night.

17  Id. at 210.  Tanabe told Howard that he was talking to "his P.I. buddy," and he identified

18  Katz's vehicle as a white pickup truck in the bar's parking lot.  Id. at 211, 216-17.  While

19  they waited in the parked patrol car, Tanabe received "updates as to the status of the

20  individual in [the bar]," specifically regarding the status of Katz's likely intoxication.  Id. at

21  218-19.  Neither Tanabe nor Howard notified police dispatch about the calls Tanabe was

22  receiving or that they were waiting in a driveway.  Id. at 220.  Tanabe asked another deputy

23  to watch the back of the bar because Tanabe was watching the front.  Id. at 492-96.

24         Tanabe asserts that at about 9:30 PM, Butler informed him that "he observed [Katz]

25  visibly intoxicated at the [bar], and Chris Butler identified [Katz's] white GMC Sierra,

26  License Plate Number 8M93029."  Tanabe Decl. ¶ 9 in Case No. 11-5771 CRB.  He also

27  asserts that he observed Katz's car swerve and almost strike a parked vehicle, make a turn

28  without signaling, and accelerate to 40 miles per hour, straddling two lanes.  Id. ¶¶ 13-15.

**United States District Court**
For the Northern District of California

He claims to have stopped Katz's car for these reasons.  Id. ¶ 16.[3]  Katz, for his part, asserts that he did not swerve, turn without signaling, or speed.  Gearinger Decl. Ex. C (dkt. 116-3) ¶¶ 5-7.  The Court accepts Katz's version of events.

Tanabe asserts that during his initial interaction with Katz, he smelled alcohol coming from the car, and observed that Katz's eyes were glassy and his speech was slurred.  Tanabe Decl. ¶ 17 in Case No. 11-5771 CRB.  Katz told Tanabe that he had had a couple of glasses of wine at the bar.  Id. ¶ 18.  Katz agreed to an eye test, and performed poorly on it.  Id. ¶ 19.  Katz also performed unsatisfactorily on the field sobriety tests Tanabe administered (and Tanabe had to explain each test multiple times).  Id. ¶ 20-22.  Katz then agreed to take a breathalyzer and measured a 0.153% and 0.146% BAC.  Id. ¶ 23.  Tanabe asserts that "[b]ased upon [Katz's] objective signs of intoxication, [and] his performance on the [field sobriety tests and eye test]," Tanabe "determined that Katz was driving [his car] under the influence of alcohol, beyond the legal limit."  Id. ¶ 24.  Tanabe arrested Katz.  Id. ¶ 25.  Tanabe later told Howard that "it was all a set-up," that Katz "needed to be dirtied up," as he "was facing some child custody and spousal support issues in family law court and that he needed to be dirtied up for . . . those proceedings."  Gearinger Decl. Ex. B at 235.

There is no dispute in either the Aksu or Katz case that Tanabe was tipped off by Butler that the Plaintiffs were intoxicated, or that, when stopped, Plaintiffs were indeed intoxicated.

## II.    LEGAL STANDARD

The Court can grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims."  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could

____

[3]  Again, Tanabe asserts that he was "never aware of any alleged scheme, plan, or effort, by Christopher Butler or anyone else, to coax and/or persuade Plaintiff to drink, or drive intoxicated, or arrest Plaintiff without probable cause."  Tanabe Decl. (dkt. 109-2) in Case No. 11-5771 CRB.  The Court accepts Plaintiffs' version of events.

United States District Court
For the Northern District of California

1   return a verdict" for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

2   A fact is material if it could affect the outcome of the suit under the governing law.  Id. at

3   248-49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  To

4   determine whether a genuine dispute as to any material fact exists, the court must view the

5   evidence in the light most favorable to the non-moving party.  Id. at 255.

6       In determining whether to grant or deny summary judgment, it is not a court's task "to

7   scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275,

8   1279 (9th Cir. 1996) (internal citation omitted).  Rather, a court is entitled to rely on the

9   nonmoving party to "identify with reasonable particularity the evidence that precludes

10  summary judgment."  Id.

11  **III.   DISCUSSION**

12      Tanabe moved for summary judgment in both the Aksu and Katz cases, arguing that

13  first, he did not violate the Plaintiffs' Fourth and Fourteenth Amendment rights, and second,

14  if he did, he is entitled to qualified immunity.  See generally MSJs.  The Court's ruling

15  denying summary judgment as to the Fourteenth Amendment claim and the related

16  conspiracy claim, see Minutes (dkt. 119) in Case No. 11-5771 CRB; Minutes (dkt. 66) in

17  Case No. 12-4268 CRB, remains unchanged.  The Court's ruling denying summary judgment

18  as to the Fourth Amendment and the related conspiracy claim, id., was, upon further

19  consideration, incorrect.  The Court now grants Tanabe summary judgment as to the Fourth

20  Amendment and the related conspiracy claim—not based on qualified immunity, but because

21  the Court finds that, even accepting Plaintiffs' version of events, Tanabe's actions do not

22  violate the Fourth Amendment under current Ninth Circuit law.

23      The Fourth Amendment guarantees "the right of the people to be secure in their

24  persons, houses, papers, and effects, against unreasonable searches and seizures."  Whren v.

25  United States, 517 U.S. 806, 809 (1996).  An automobile stop qualifies as a seizure for the

26  purposes of the Fourth Amendment and must be reasonable under the circumstances.  Id. at

27  810.  An arrest is also a seizure and must be reasonable under the circumstances.  Ashcroft v.

28  al-Kidd, 131 S. Ct. 2074, 2080 (2011).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

**A.  Reasonable Suspicion for Traffic Stop**

2     As an initial matter, the Court rejects in light of the parties' factual dispute Tanabe's

3    arguments that Plaintiffs' driving justified the traffic stops.  See MSJ at 7 in Case No.

4    11-5771 CRB; MSJ at 7-8 in Case No. 12-4268 CRB.  Instead, the Court finds that Tanabe

5    had reasonable suspicion to stop the cars in light of Butler's tips.

6     "Investigatory traffic stops are akin to the on-the-street encounters addressed in Terry

7    v. Ohio, 392 U.S. 1 (1968).  Accordingly, the same objective standard applies: a police

8    officer may conduct an investigatory traffic stop if the officer has 'reasonable suspicion' that

9    a particular person 'has committed, is committing, or is about to commit a crime.'"  United

10    States v. Choudhry, 461 F.3d 1097, 1100 (9th Cir. 2006).  An officer has reasonable

11    suspicion to stop a vehicle when "specific, articulable facts . . . together with objective and

12    reasonable inferences, form the basis for suspecting that the particular person detained is

13    engaged in criminal activity."  Id. at 1100 (internal quotation marks omitted).

14     The reasonable suspicion necessary to justify a stop depends on both the content of

15    information the police possess and its reliability.  Alabama v. White, 496 U.S. 325, 330

16    (1990).  The content of the information Butler provided was certainly detailed enough to

17    support a police officer's belief that a crime was about to occur.  Butler told Tanabe that

18    Plaintiffs were intoxicated, he accurately identified Plaintiffs' vehicles and their locations,

19    and he predicted that the vehicles would leave the bar when they did.  See, e.g., Tanabe Decl.

20    ¶ 9 in Case No. 11-5771 CRB.  To determine whether a tip is sufficiently reliable to support

21    reasonable suspicion, courts are to use a totality of the circumstances test.  See Massachusetts

22    v. Upton, 466 U.S. 727, 732 (1984) (per curium).  Anonymous tips can sometimes be

23    sufficiently reliable.  Compare White, 496 U.S. at 332 (anonymous tip reliable where it

24    contained a range of details, corroborated by officer, and caller predicted driver's future

25    behavior, demonstrating "special familiarity with [driver's] affairs."), with Florida v. J.L.,

26    529 U.S. 266, 271-72 (2000) (noting that an anonymous tip "seldom demonstrates the

27    informant's basis of knowledge" and finding tip insufficient where caller did not explain how

28    he knew about gun and made no prediction about future behavior).  In Navarette v.

United States District Court
For the Northern District of California

<u>California</u>, 134 S. Ct. 1683, 1686-87 (2014), the Supreme Court recently found reliable an anonymous drunk driving tip from a 911 caller who communicated a detailed description of the vehicle, the direction in which the vehicle was traveling, and that the vehicle had run the caller off the road.  The Court noted that "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving" and that there was "reason to think that the caller . . . was telling the truth," as the timeline she described was consistent with the police officer's finding the driver, and the caller used the 911 system.  <u>Id.</u> at 1689-90.

Tanabe argues that if even anonymous tips can be reliable, certainly Butler's was. MSJ at 11-12 in Case No. 11-5771 CRB; MSJ at 12 in Case No. 12-4268 CRB.  As Tanabe tells it, Butler was "a source [Tanabe] was familiar with and one who was a former trained police officer, [Tanabe] understood that the nature of Mr. Butler's work as a private investigator was to observe his 'targets,'" and Butler had knowledge of what was happening at the bar "and how much alcohol [Plaintiffs were] consuming over a specific period of time."  <u>Id.</u>  No doubt Tanabe truncates the basis of Butler's knowledge.  Butler was not only a former trained police officer and current private investigator who happened to be in the bar observing Plaintiffs' alcohol consumption; he had planned, with Tanabe, these and other dirty DUIs, and even agreed to pay Tanabe with a Glock firearm.  <u>See</u> Gearinger Decl. Ex. A at 839, 931, 935, 940 in Case No. 11-5771 CRB.  While it is perhaps counterintuitive, then, to deem Butler a "reliable" source, Butler is indeed reliable on the subject of Plaintiffs' inebriation.  By engineering Plaintiffs' inebriation, Butler had a "special familiarity with [Plaintiffs'] affairs."  <u>See</u> <u>White</u>, 496 U.S. at 332.  Butler was biased—he had an interest in seeing Plaintiffs arrested for DUI.  But the purpose of the dirty DUI scheme was to catch Plaintiffs driving under the influence and to use their DUI arrests (and perhaps prosecutions) against Plaintiffs in family court—had Plaintiffs not really been driving while intoxicated, the scheme would have failed.[4]  There was thus good "reason to think that [Butler] was

---

[4] Plaintiffs' briefs recount Butler's testimony that the plan was contingent on Plaintiffs actually drinking to excess.  <u>See, e.g.</u>, Opp'n at 2 in Case No. 11-5771 CRB ("<u>if</u> a person consumed enough alcohol to be over .08 and then that person got behind the wheel of a car and started to operate it, we were going to call [Tanabe].") (emphasis added).

**United States District Court**
For the Northern District of California

1   telling the truth." See Navarette, 134 S. Ct. at 1689.

2          "'[V]iewed from the standpoint of an objectively reasonable police officer," Butler's

3   tip therefore created reasonable suspicion that Plaintiffs were engaged in criminal activity,

4   and the stops were warranted.  See Navarette, 134 S. Ct. at 1690.

5          **B.  Probable Cause for Arrest**

6          The Court also holds that there was probable cause for Plaintiffs' arrests.

7          The Fourth Amendment requires that a warrantless arrest be supported by probable

8   cause that a criminal offense has been or is being committed.  Devenpeck v. Alford, 543 U.S.

9   146, 152 (2004).  "In California, an officer has probable cause for a warrantless arrest if the

10  facts known to him would lead a [person] of ordinary care and prudence to believe and

11  conscientiously entertain an honest and strong suspicion that a person is guilty of a crime."

12  Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007) (internal quotation marks

13  omitted).  "Federal standards are consistent: The test for whether probable cause exists is

14  whether at the moment or arrest the facts and circumstances within the knowledge of the

15  arresting officers and of which they had reasonably trustworthy information were sufficient

16  to warrant a prudent [person] in believing that the petitioner had committed or was

17  committing an offense."  Id. (internal quotation marks omitted).  Importantly, "an arresting

18  officer's state of mind (except for the facts that he knows) is irrelevant to the existence of

19  probable cause. . . . That is to say, his subjective reason for making the arrest need not be the

20  criminal offense as to which the known facts provide probable cause."  Devenpeck, 543 U.S.

21  at 593-94 (internal citations omitted).

22          Neither Plaintiff disputes that, once Tanabe stopped them, they looked inebriated,

23  conceded that they had consumed alcohol, agreed to undergo field sobriety and breathalyzer

24  tests, and performed poorly on those tests.  These facts and circumstances were sufficient to

25  warrant a prudent person to believe that Plaintiffs were committing the offense of drunk

26  driving.  See Blankenhorn, 485 F.3d at 471.  Plaintiffs argue that their arrests were

27  nonetheless illegal because (1) Tanabe is collaterally estopped from arguing their legality and

28  (2) Tanabe's role in the dirty DUI scheme negates probable cause.  Both arguments are

United States District Court
For the Northern District of California

1    unpersuasive.

2        Plaintiffs urge that Tanabe is collaterally estopped from arguing the legitimacy of

3    their arrests by his prior convictions for committing illegal arrests.  <u>See</u> Katz Opp'n in Case

4    No. 11-5771 CRB; Aksu Opp'n (dkt. 63) in Case No. 12-4268 CRB.  Collateral estoppel bars

5    the relitigation of issues explicitly litigated and necessarily decided in a prior case.  <u>Hiser v.</u>

6    <u>Franklin</u>, 94 F.3d 1287, 1292 (9th Cir. 1996).  The Ninth Circuit test to foreclose the

7    relitigation of an issue is: (1) the issue at stake must be identical to the one alleged in the

8    prior litigation; (2) the issue must have been actually litigated by the party against whom

9    preclusion is asserted; and (3) the determination of he issue in the prior litigation must have

10   been a critical and necessary part of the judgment in the earlier action.  <u>Gospel Missions v.</u>

11   <u>City of Los Angeles</u>, 328 F.3d 548, 553-54 (9th Cir. 2003).  The issue before this Court is

12   whether Tanabe violated Plaintiffs' constitutional rights.  The issues in the criminal case

13   were whether Tanabe committed bribery, dishonest services, and wire fraud.  <u>See</u> Gearinger

14   Decl. Exs. D-F (dkt. 116-3) (indictment, jury instructions and verdict form in criminal case)

15   in Case No. 11-5771 CRB.  These are not identical issues.  Nor was the legality of Plaintiffs'

16   arrests a necessary part of the criminal case, as the jury was not asked to determine whether

17   there was probable cause for the arrests.  <u>See</u> Gearinger Decl. Ex. F in Case No. 11-5771

18   CRB.  Collateral estoppel does not preclude Tanabe from litigating the conspiracy claims for

19   the same reasons; as Tanabe explains, "Defendant was not convicted of conspiring to violate

20   [P]laintiff[s'] constitutional rights."  <u>See</u> Reply (dkt. 117) in Case. No. 11-5771 CRB.

21       Plaintiffs also argue that the ample probable cause here is negated by

22   entrapment—that because Tanabe conspired to set them up for these DUIs, he could not have

23   had probable cause.  Katz Opp'n at 11-14 in Case No. 11-5771 CRB; Aksu Opp'n at 11-14 in

24   Case No. 12-4268 CRB.  But that is not the current state of the law in this Circuit.  Courts

25   within the Ninth Circuit have declined to decide the issue of how entrapment affects probable

26   cause, and have only assumed <u>arguendo</u> that entrapment vitiates probable cause in the course

27   of determining that there was no evidence of entrapment.  <u>See, e.g.</u>, <u>United States v. Marin</u>,

28   138 F. App'x 945, 946 (9th Cir. 2005) ("Entrapment is an affirmative defense . . . and even

10

United States District Court
For the Northern District of California

assuming <u>arguendo</u> that entrapment could somehow vitiate a probable cause determination,

Marin was not entrapped as a matter of law"); <u>Beauregard v. Wingard</u>, 362 F.2d 901, 904

(9th Cir. 1966) ("Appellant argues that the jury's findings establish as a matter of law that he

was entrapped into commission of his crime and that such entrapment destroys probable

cause for arrest.  Assuming <u>arguendo</u> that such would be the result, the same argument was

made to the trial court and was rejected"); <u>Rolon v. Los Angeles Cnty.</u>, No. 07-5231-

PA(AGR), 2008 WL 4960442, at *5 n.5 (C.D. Cal. Nov. 20, 2008) aff'd, 358 F. App'x 898

(9th Cir. 2009) ("Thus, even assuming without deciding that an entrapment defense could

somehow negate a probable cause determination, Plaintiff submits no evidence of

entrapment.").[5]  The court in <u>Beauregard</u> in fact held that "probable cause for arrest is not

nullified by the fact that the otherwise successful investigation was maliciously inspired."

362 F.2d at 903.  Until and unless the Ninth Circuit holds that entrapment negates probable

cause, this Court's hands are tied.  There was probable cause here.

     Because there was both reasonable suspicion to stop Plaintiffs' cars and probable

cause to arrest Plaintiffs for driving under the influence, Tanabe did not violate Plaintiffs'

Fourth Amendment rights.  The related conspiracy claims also fail.  <u>See</u> <u>Sprewell v. Golden

State Warriors</u>, 266 F.3d 979, 992 (9th Cir. 2001) ("to sustain a claim of civil conspiracy,

Sprewell must prove that the NBA and the Warriors have committed an underlying tort.").

## IV.   CONCLUSION

     For the foregoing reasons, the Court GRANTS IN PART Tanabe's Motions as to

//

//

---

[5] Other circuits have more squarely addressed this issue.  <u>See, e.g.</u>, <u>Pinter v. City of New York</u>, 448 F. App'x 99, n.6 105 (2d Cir. 2011) (quoting <u>DiBlasio v. City of New York</u>, 102 F.3d 654, 656–57 (2d Cir. 1996) ("While entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation.") (quotation marks omitted); <u>Jackson v. Capraun</u>, No. 09-1737, 2011 WL 4344589, at *4 (M.D. Fla. Sept. 15, 2011) aff'd, 534 F. App'x 854 (11th Cir. 2013) ("claim of entrapment is not sufficient to support section 1983 liability or to negate probable cause"); <u>Fridley v. Horrighs</u>, 291 F.3d 867, 873 (6th Cir. 2002) ("a police officer is not required to inquire into the facts and circumstances in an effort to discover if the suspect has an affirmative defense"—rather, "if a reasonable officer would not 'conclusively know' that the suspect is protected by the defense, then he is free to arrest the suspect provided there is probable cause to do so. . . .").

Plaintiffs' Fourth Amendment claims and the related conspiracy claims.

**IT IS SO ORDERED.**

Dated: April 27, 2015

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

12