IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASAN ARDA AKSU,<br><br>　　Plaintiff,<br><br>v.<br><br>COUNTY OF CONTRA COSTA et al.,<br><br>　　Defendant. | No. C12-04268 CRB |
| MITCHELL KATZ,<br><br>　　Plaintiff,<br><br>v.<br><br>COUNTY OF CONTRA COSTA, et al.,<br><br>　　Defendants | No. C11-5771 CRB<br><br>**ORDER GRANTING IN PART MOTIONS FOR SUMMARY JUDGMENT** |

Having granted Defendant Stephen Tanabe's motion to reconsider at the April 17, 2015 motion hearing, the Court hereby GRANTS IN PART Tanabe's Motions for Summary Judgment as to Plaintiffs' Fourth Amendment claims, and the related conspiracy claims, in the Katz and Aksu cases. See MSJ (dkt. 60) in Case No. 12-4268 CRB; MSJ (dkt. 109) in Case No. 11-5771 CRB.

## I. BACKGROUND

Defendant Stephen Tanabe was, at all relevant times, a deputy sheriff employed with the Contra Costa County Sheriff's Office and assigned to the Danville Police Department. Tanabe Decl. (dkt. 109-2) ¶¶ 2, 6 in Case No. 11-5771 CRB. Tanabe met Defendant Christopher Butler when Tanabe worked as a police officer for the Antioch Police Department between 1995 and 1997. Id. ¶ 4. Sometime after Tanabe left the Antioch Police Department, Butler left that department to start his own private investigation firm. Id. ¶ 5. The two stayed in touch.

As of October 21, 2010,[1] Butler had spoken with Tanabe about participating in a dirty DUI scheme. See Gearinger Decl. Ex. A (dkt. 116-1) at 839 in Case No. 11-5771 CRB. "Tanabe offered to be that officer who would initiate the traffic stop if we could perform the DUI stings in Danville." Id. Butler communicated Tanabe's role in the DUI stings: "if the person consumed enough alcohol to be over .08 and then that person got behind the wheel of a car and started to operate it, we were going to call him and have him effect a traffic stop." Id. at 846.

### A. Relevant Facts as to Aksu

On the evening of January 9, 2011, Butler contacted Tanabe to determine whether Tanabe would be working. Id. at 876. Tanabe confirmed that he was, and Butler responded, "We will be trying that DUI again tonight." Id. "The plan [on January 9, 2011] was to contact Mr. Aksu using a ruse," having one of Butler's employees "pose as a reporter who was doing a story about successful immigrant businessmen in the East Bay and wanted to include him in a story." Id. at 869-70. Aksu was at the bar that night for approximately two and a half hours. Levitskaia Decl. Ex A (dkt. 60-1) at 355 in Case No. 12-4268 CRB. Once Butler learned that his employee had enticed Aksu to consume enough alcohol that Aksu's blood alcohol level was likely over .08, Butler contacted Tanabe. See Gearinger Decl. Ex. A at 882-83, 90-91 in Case No. 11-5771 CRB. Tanabe asserts: "[a]t approximately 9 pm on

---

[1] Katz's opposition brief states that this date is October 21, 2011. Opp'n (dkt. 116) at 2 in Case No. 11-5771. The transcript just says "October 21." See Gearinger Decl. Ex. A at 839 in Case No. 11-5771 CRB. 2011 makes little sense in the case's chronology.

2

January, 2011, Chris Butler informed me he observed [Aksu] visibly intoxicated at the Vine Bar, in Danville, CA, and Chris Butler identified Plaintiff's dark grey Lexus SUV, License Plate Number 5WGG213." Tanabe Decl. (dkt. 60-2) ¶ 9 in Case No. 12-4268 CRB. Butler testified that he sent Tanabe a text message stating "[t]hey are up and heading for the door. The guy keeps talking." Gearinger Decl. Ex. A at 890-91 in Case No. 11-5771 CRB. Butler then observed that Tanabe's patrol car had its lights activated and a car pulled over in front of it, and he videotaped Tanabe arresting and handcuffing Aksu. Id. at 894-95. Tanabe claims that he stopped Aksu's car because it was traveling at a "high rate of speed." Tanabe Decl. (dkt. 60-2) ¶¶ 13, 16 in Case No. 12-4268 CRB.[2] Aksu asserts that he "never drove at a high rate of speed." Aksu Decl. (dkt. 63-3) ¶ 5 Case No. 12-4268 CRB. The Court accepts Aksu's version of events.

Tanabe asserts that when he approached Aksu's car, he noticed the odor of an alcoholic beverage and observed that Aksu's eyes were red and glassy. Tanabe Decl. ¶ 17 in Case No. 12-4268 CRB. Tanabe asked Aksu if he had been drinking and Aksu answered that he had had two glasses of wine at the bar. Id. ¶ 18. Aksu testified that he told Tanabe "that I had some drinks." Levitskaia Decl. Ex A at 357 in Case No. 12-4268 CRB. Aksu agreed to let Tanabe check his eyes, and then performed poorly on the eye test. Tanabe Decl. ¶ 19 in Case No. 12-4268 CRB. Aksu then performed unsatisfactorily on further field sobriety tests. Id. ¶ 20. Tanabe administered a breathalyzer test, and Aksu measured a 0.118% BAC. Id. ¶ 22. Tanabe concluded that "[b]ased upon [Aksu's] objective signs of intoxication, his performance on the FST's, and the results from his [eye test] . . . that [Aksu] was driving . . . under the influence of alcohol, beyond the legal limit," and arrested him. Id. ¶¶ 23-24. Aksu subsequently took a breath test at the Danville Police Department and scored a 0.13% and 0.12% BAC. Id. ¶ 25.

//

---

[2] Tanabe also claims that he was "never aware of any alleged scheme, plan, or effort by Chris Butler or anyone else, to coax and/or persuade Plaintiff to drink, or drive intoxicated, or arrest Plaintiff without probable cause." Id. ¶ 11. For the purposes of this Order, the Court accepts Plaintiffs' version of events.

3

### B. Relevant Facts as to Katz

On the evening of January 14, 2011, Butler confirmed with Tanabe that he would be working that night and able to effect a traffic stop on Katz. Gearinger Decl. Ex. A at 919 in Case No. 11-5771 CRB. This time the planned DUI sting involved leading Katz to believe that an employee of Butler's worked for Lifetime Television and wanted to showcase Katz's winery. Id. at 911. Butler monitored the DUI sting, including requesting a "tally of how much [alcohol] [Katz] had consumed," and he kept Tanabe informed as the night progressed. Id. at 916-19. Butler knew that Tanabe "was standing by." Id. at 920. Tanabe texted Butler to ask about Katz's alcohol consumption, and Butler responded "He's wasted." Id. at 920-21. Butler then watched Tanabe pull Katz over and he videotaped Katz's arrest. Id. at 923.

Tanabe was assigned to ride along with a Reserve Deputy William Howard on the night of January 14, 2011. Gearinger Decl. Ex. B at 204, 206. Tanabe told Howard "that we were going to be conducting a dirty DUI that evening," and he gave Howard "some particulars about the person that was going to be the subject of the arrest." Id. at 207-08. Howard recalls that Tanabe got a series of calls on his personal cell phone during that night. Id. at 210. Tanabe told Howard that he was talking to "his P.I. buddy," and he identified Katz's vehicle as a white pickup truck in the bar's parking lot. Id. at 211, 216-17. While they waited in the parked patrol car, Tanabe received "updates as to the status of the individual in [the bar]," specifically regarding the status of Katz's likely intoxication. Id. at 218-19. Neither Tanabe nor Howard notified police dispatch about the calls Tanabe was receiving or that they were waiting in a driveway. Id. at 220. Tanabe asked another deputy to watch the back of the bar because Tanabe was watching the front. Id. at 492-96.

Tanabe asserts that at about 9:30 PM, Butler informed him that "he observed [Katz] visibly intoxicated at the [bar], and Chris Butler identified [Katz's] white GMC Sierra, License Plate Number 8M93029." Tanabe Decl. ¶ 9 in Case No. 11-5771 CRB. He also asserts that he observed Katz's car swerve and almost strike a parked vehicle, make a turn without signaling, and accelerate to 40 miles per hour, straddling two lanes. Id. ¶¶ 13-15.

4

1 He claims to have stopped Katz's car for these reasons. Id. ¶ 16.[3] Katz, for his part, asserts
2 that he did not swerve, turn without signaling, or speed. Gearinger Decl. Ex. C (dkt. 116-3)
3 ¶¶ 5-7. The Court accepts Katz's version of events.

4 Tanabe asserts that during his initial interaction with Katz, he smelled alcohol coming
5 from the car, and observed that Katz's eyes were glassy and his speech was slurred. Tanabe
6 Decl. ¶ 17 in Case No. 11-5771 CRB. Katz told Tanabe that he had had a couple of glasses
7 of wine at the bar. Id. ¶ 18. Katz agreed to an eye test, and performed poorly on it. Id. ¶ 19.
8 Katz also performed unsatisfactorily on the field sobriety tests Tanabe administered (and
9 Tanabe had to explain each test multiple times). Id. ¶ 20-22. Katz then agreed to take a
10 breathalyzer and measured a 0.153% and 0.146% BAC. Id. ¶ 23. Tanabe asserts that
11 "[b]ased upon [Katz's] objective signs of intoxication, [and] his performance on the [field
12 sobriety tests and eye test]," Tanabe "determined that Katz was driving [his car] under the
13 influence of alcohol, beyond the legal limit." Id. ¶ 24. Tanabe arrested Katz. Id. ¶ 25.
14 Tanabe later told Howard that "it was all a set-up," that Katz "needed to be dirtied up," as he
15 "was facing some child custody and spousal support issues in family law court and that he
16 needed to be dirtied up for . . . those proceedings." Gearinger Decl. Ex. B at 235.

17 There is no dispute in either the Aksu or Katz case that Tanabe was tipped off by
18 Butler that the Plaintiffs were intoxicated, or that, when stopped, Plaintiffs were indeed
19 intoxicated.

20 **II.  LEGAL STANDARD**

21 The Court can grant a motion for summary judgment "if the movant shows that there
22 is no genuine dispute as to any material fact and the movant is entitled to judgment as a
23 matter of law." Fed. R. Civ. Proc. 56(a). A principal purpose of summary judgment "is to
24 isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317,
25 323-24 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

---

27 [3] Again, Tanabe asserts that he was "never aware of any alleged scheme, plan, or effort, by
28 Christopher Butler or anyone else, to coax and/or persuade Plaintiff to drink, or drive intoxicated, or arrest Plaintiff without probable cause." Tanabe Decl. (dkt. 109-2) in Case No. 11-5771 CRB. The Court accepts Plaintiffs' version of events.

5

return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. Id. at 248-49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). To determine whether a genuine dispute as to any material fact exists, the court must view the evidence in the light most favorable to the non-moving party. Id. at 255.

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted). Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." Id.

### III. DISCUSSION

Tanabe moved for summary judgment in both the Aksu and Katz cases, arguing that first, he did not violate the Plaintiffs' Fourth and Fourteenth Amendment rights, and second, if he did, he is entitled to qualified immunity. See generally MSJs. The Court's ruling denying summary judgment as to the Fourteenth Amendment claim and the related conspiracy claim, see Minutes (dkt. 119) in Case No. 11-5771 CRB; Minutes (dkt. 66) in Case No. 12-4268 CRB, remains unchanged. The Court's ruling denying summary judgment as to the Fourth Amendment and the related conspiracy claim, id., was, upon further consideration, incorrect. The Court now grants Tanabe summary judgment as to the Fourth Amendment and the related conspiracy claim—not based on qualified immunity, but because the Court finds that, even accepting Plaintiffs' version of events, Tanabe's actions do not violate the Fourth Amendment under current Ninth Circuit law.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Whren v. United States, 517 U.S. 806, 809 (1996). An automobile stop qualifies as a seizure for the purposes of the Fourth Amendment and must be reasonable under the circumstances. Id. at 810. An arrest is also a seizure and must be reasonable under the circumstances. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011).

6

### A. Reasonable Suspicion for Traffic Stop

As an initial matter, the Court rejects in light of the parties' factual dispute Tanabe's arguments that Plaintiffs' driving justified the traffic stops. See MSJ at 7 in Case No. 11-5771 CRB; MSJ at 7-8 in Case No. 12-4268 CRB. Instead, the Court finds that Tanabe had reasonable suspicion to stop the cars in light of Butler's tips.

"Investigatory traffic stops are akin to the on-the-street encounters addressed in Terry v. Ohio, 392 U.S. 1 (1968). Accordingly, the same objective standard applies: a police officer may conduct an investigatory traffic stop if the officer has 'reasonable suspicion' that a particular person 'has committed, is committing, or is about to commit a crime.'" United States v. Choudhry, 461 F.3d 1097, 1100 (9th Cir. 2006). An officer has reasonable suspicion to stop a vehicle when "specific, articulable facts . . . together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." Id. at 1100 (internal quotation marks omitted).

The reasonable suspicion necessary to justify a stop depends on both the content of information the police possess and its reliability. Alabama v. White, 496 U.S. 325, 330 (1990). The content of the information Butler provided was certainly detailed enough to support a police officer's belief that a crime was about to occur. Butler told Tanabe that Plaintiffs were intoxicated, he accurately identified Plaintiffs' vehicles and their locations, and he predicted that the vehicles would leave the bar when they did. See, e.g., Tanabe Decl. ¶ 9 in Case No. 11-5771 CRB. To determine whether a tip is sufficiently reliable to support reasonable suspicion, courts are to use a totality of the circumstances test. See Massachusetts v. Upton, 466 U.S. 727, 732 (1984) (per curium). Anonymous tips can sometimes be sufficiently reliable. Compare White, 496 U.S. at 332 (anonymous tip reliable where it contained a range of details, corroborated by officer, and caller predicted driver's future behavior, demonstrating "special familiarity with [driver's] affairs."), with Florida v. J.L., 529 U.S. 266, 271-72 (2000) (noting that an anonymous tip "seldom demonstrates the informant's basis of knowledge" and finding tip insufficient where caller did not explain how he knew about gun and made no prediction about future behavior). In Navarette v.

7

1 California, 134 S. Ct. 1683, 1686-87 (2014), the Supreme Court recently found reliable an
2 anonymous drunk driving tip from a 911 caller who communicated a detailed description of
3 the vehicle, the direction in which the vehicle was traveling, and that the vehicle had run the
4 caller off the road.  The Court noted that "the caller necessarily claimed eyewitness
5 knowledge of the alleged dangerous driving" and that there was "reason to think that the
6 caller . . . was telling the truth," as the timeline she described was consistent with the police
7 officer's finding the driver, and the caller used the 911 system.  Id. at 1689-90.

Tanabe argues that if even anonymous tips can be reliable, certainly Butler's was.
MSJ at 11-12 in Case No. 11-5771 CRB; MSJ at 12 in Case No. 12-4268 CRB.  As Tanabe
tells it, Butler was "a source [Tanabe] was familiar with and one who was a former trained
police officer, [Tanabe] understood that the nature of Mr. Butler's work as a private
investigator was to observe his 'targets,'" and Butler had knowledge of what was happening
at the bar "and how much alcohol [Plaintiffs were] consuming over a specific period of
time."  Id.  No doubt Tanabe truncates the basis of Butler's knowledge.  Butler was not only
a former trained police officer and current private investigator who happened to be in the bar
observing Plaintiffs' alcohol consumption; he had planned, with Tanabe, these and other
dirty DUIs, and even agreed to pay Tanabe with a Glock firearm.  See Gearinger Decl. Ex. A
at 839, 931, 935, 940 in Case No. 11-5771 CRB.  While it is perhaps counterintuitive, then,
to deem Butler a "reliable" source, Butler is indeed reliable on the subject of Plaintiffs'
inebriation.  By engineering Plaintiffs' inebriation, Butler had a "special familiarity with
[Plaintiffs'] affairs."  See White, 496 U.S. at 332.  Butler was biased—he had an interest in
seeing Plaintiffs arrested for DUI.  But the purpose of the dirty DUI scheme was to catch
Plaintiffs driving under the influence and to use their DUI arrests (and perhaps prosecutions)
against Plaintiffs in family court—had Plaintiffs not really been driving while intoxicated,
the scheme would have failed.[4]  There was thus good "reason to think that [Butler] was

---

[4] Plaintiffs' briefs recount Butler's testimony that the plan was contingent on Plaintiffs actually drinking to excess.  See, e.g., Opp'n at 2 in Case No. 11-5771 CRB ("if a person consumed enough alcohol to be over .08 and then that person got behind the wheel of a car and started to operate it, we were going to call [Tanabe].") (emphasis added).

8

telling the truth." See Navarette, 134 S. Ct. at 1689.

"'[V]iewed from the standpoint of an objectively reasonable police officer," Butler's tip therefore created reasonable suspicion that Plaintiffs were engaged in criminal activity, and the stops were warranted. See Navarette, 134 S. Ct. at 1690.

### B. Probable Cause for Arrest

The Court also holds that there was probable cause for Plaintiffs' arrests.

The Fourth Amendment requires that a warrantless arrest be supported by probable cause that a criminal offense has been or is being committed. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "In California, an officer has probable cause for a warrantless arrest if the facts known to him would lead a [person] of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that a person is guilty of a crime." Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007) (internal quotation marks omitted). "Federal standards are consistent: The test for whether probable cause exists is whether at the moment or arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." Id. (internal quotation marks omitted). Importantly, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause. . . . That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Devenpeck, 543 U.S. at 593-94 (internal citations omitted).

Neither Plaintiff disputes that, once Tanabe stopped them, they looked inebriated, conceded that they had consumed alcohol, agreed to undergo field sobriety and breathalyzer tests, and performed poorly on those tests. These facts and circumstances were sufficient to warrant a prudent person to believe that Plaintiffs were committing the offense of drunk driving. See Blankenhorn, 485 F.3d at 471. Plaintiffs argue that their arrests were nonetheless illegal because (1) Tanabe is collaterally estopped from arguing their legality and (2) Tanabe's role in the dirty DUI scheme negates probable cause. Both arguments are

9

unpersuasive.

Plaintiffs urge that Tanabe is collaterally estopped from arguing the legitimacy of their arrests by his prior convictions for committing illegal arrests. See Katz Opp'n in Case No. 11-5771 CRB; Aksu Opp'n (dkt. 63) in Case No. 12-4268 CRB. Collateral estoppel bars the relitigation of issues explicitly litigated and necessarily decided in a prior case. Hiser v. Franklin, 94 F.3d 1287, 1292 (9th Cir. 1996). The Ninth Circuit test to foreclose the relitigation of an issue is: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated by the party against whom preclusion is asserted; and (3) the determination of he issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action. Gospel Missions v. City of Los Angeles, 328 F.3d 548, 553-54 (9th Cir. 2003). The issue before this Court is whether Tanabe violated Plaintiffs' constitutional rights. The issues in the criminal case were whether Tanabe committed bribery, dishonest services, and wire fraud. See Gearinger Decl. Exs. D-F (dkt. 116-3) (indictment, jury instructions and verdict form in criminal case) in Case No. 11-5771 CRB. These are not identical issues. Nor was the legality of Plaintiffs' arrests a necessary part of the criminal case, as the jury was not asked to determine whether there was probable cause for the arrests. See Gearinger Decl. Ex. F in Case No. 11-5771 CRB. Collateral estoppel does not preclude Tanabe from litigating the conspiracy claims for the same reasons; as Tanabe explains, "Defendant was not convicted of conspiring to violate [P]laintiff[s'] constitutional rights." See Reply (dkt. 117) in Case. No. 11-5771 CRB.

Plaintiffs also argue that the ample probable cause here is negated by entrapment—that because Tanabe conspired to set them up for these DUIs, he could not have had probable cause. Katz Opp'n at 11-14 in Case No. 11-5771 CRB; Aksu Opp'n at 11-14 in Case No. 12-4268 CRB. But that is not the current state of the law in this Circuit. Courts within the Ninth Circuit have declined to decide the issue of how entrapment affects probable cause, and have only assumed arguendo that entrapment vitiates probable cause in the course of determining that there was no evidence of entrapment. See, e.g., United States v. Marin, 138 F. App'x 945, 946 (9th Cir. 2005) ("Entrapment is an affirmative defense . . . and even

10

assuming <u>arguendo</u> that entrapment could somehow vitiate a probable cause determination, Marin was not entrapped as a matter of law"); Beauregard v. Wingard, 362 F.2d 901, 904 (9th Cir. 1966) ("Appellant argues that the jury's findings establish as a matter of law that he was entrapped into commission of his crime and that such entrapment destroys probable cause for arrest.  Assuming arguendo that such would be the result, the same argument was made to the trial court and was rejected"); Rolon v. Los Angeles Cnty., No. 07-5231-PA(AGR), 2008 WL 4960442, at *5 n.5 (C.D. Cal. Nov. 20, 2008) aff'd, 358 F. App'x 898 (9th Cir. 2009) ("Thus, even assuming without deciding that an entrapment defense could somehow negate a probable cause determination, Plaintiff submits no evidence of entrapment.").[5]  The court in Beauregard in fact held that "probable cause for arrest is not nullified by the fact that the otherwise successful investigation was maliciously inspired." 362 F.2d at 903.  Until and unless the Ninth Circuit holds that entrapment negates probable cause, this Court's hands are tied.  There was probable cause here.

Because there was both reasonable suspicion to stop Plaintiffs' cars and probable cause to arrest Plaintiffs for driving under the influence, Tanabe did not violate Plaintiffs' Fourth Amendment rights.  The related conspiracy claims also fail.  See Sprewell v. Golden State Warriors, 266 F.3d 979, 992 (9th Cir. 2001) ("to sustain a claim of civil conspiracy, Sprewell must prove that the NBA and the Warriors have committed an underlying tort.").

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Tanabe's Motions as to

//

//

---

[5] Other circuits have more squarely addressed this issue.  See, e.g., Pinter v. City of New York, 448 F. App'x 99, n.6 105 (2d Cir. 2011) (quoting DiBlasio v. City of New York, 102 F.3d 654, 656–57 (2d Cir. 1996) ("While entrapment may be a proper defense in a criminal action, a police officer's participation in such activity does not constitute a constitutional violation.") (quotation marks omitted); Jackson v. Capraun, No. 09-1737, 2011 WL 4344589, at *4 (M.D. Fla. Sept. 15, 2011) aff'd, 534 F. App'x 854 (11th Cir. 2013) ("claim of entrapment is not sufficient to support section 1983 liability or to negate probable cause"); Fridley v. Horrighs, 291 F.3d 867, 873 (6th Cir. 2002) ("a police officer is not required to inquire into the facts and circumstances in an effort to discover if the suspect has an affirmative defense"—rather, "if a reasonable officer would not 'conclusively know' that the suspect is protected by the defense, then he is free to arrest the suspect provided there is probable cause to do so. . . .").

11

Plaintiffs' Fourth Amendment claims and the related conspiracy claims.

**IT IS SO ORDERED.**

Dated: July 31, 2015

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE